**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| COLUMBUS LIFE INSURANCE COMPANY, | |
| Plaintiff, | Case No. |
| v. | **COMPLAINT** |
| JC MARKETING PARTNERS, INC., JUN RONG CHEN (a/k/a John Chen), CUI CUI FANG (a/k/a Bella Fang), CHEN GUAN HUANG (a/k/a Jason Huang), JIN YAN YANG (a/k/a Janett Yang), Bi Jin Chen, Feng Zeng Chen, Min Juan Chen, Bang Liu, Yan Ping You, Hong Yan Zhang, Christopher Wang, M.D., and Jenny Cheng, M.D., | DEMAND FOR JURY TRIAL |
| Defendants. | |

Plaintiff Columbus Life Insurance Company, through counsel, files this complaint against JC Marketing Partners, Inc. (f/k/a Golden Cove Financial Group, Inc. and JMC Insurance Network, Inc.), Jun Rong Chen (a/k/a John Chen), Cui Cui Fang (a/k/a Bella Fang), Chen Guan Huang (a/k/a Jason Huang), Jin Yan Yang (a/k/a Jinyan Yang a/k/a Janett Yang), Bi Jin Chen, Feng Zheng Chen, Min Juan Chen, Bang Liu, Yan Ping You, Hong Yan Zhang, Christopher Wang, M.D., and Jenny Cheng, M.D., (collectively, "Defendants"), and alleges as follows:

## NATURE OF THE CASE

1.      Columbus Life Insurance Company ("Columbus Life") entrusted its former producer group, JC Marketing Partners, Inc. ("JC Marketing") to solicit and submit legitimate life insurance applications for people who wanted and needed to protect their families from loss. But instead, JC Marketing and the other Defendants formed an illegal enterprise and used it to abuse Columbus Life's confidences by, among other things, intentionally submitting fraudulent

applications, falsifying medical records, and falsifying signatures – all in an attempt to generate massive commissions and defraud Columbus Life into issuing hundreds of fraudulent and damaging human life wagering policies with a combined face amount of over $160 million. Defendants' fraudulent conduct breached JC Marketing's contract and its affiliated producers' contracts with Columbus Life. Moreover, Defendants' conduct violates the Racketeer Influenced and Corrupt Organization ("RICO") Act, 18 U.S.C. §§ 1961-1968, the New Jersey Insurance Fraud Prevention Act, N.J.S.A. 17:33A, *et seq*., and has resulted in Defendants being unjustly enriched at Columbus Life's expense.

## PARTIES

2.      Plaintiff Columbus Life is a life insurance company organized and existing under the laws of Ohio, with its principal place of business at 400 Broadway, Cincinnati, Ohio 45202. Columbus Life is a citizen of the State of Ohio.

3.      Defendant JC Marketing, formerly known as Golden Cove Financial Group, Inc. ("Golden Cove") and JMC Insurance Network, Inc. ("JMC Ins."), is an insurance broker general agency affiliated with a network of individual life insurance producers. JC Marketing is incorporated and existing under the laws of Georgia, with its listed principal place of business at 8735 Dunwoody Place, Ste R, Atlanta, Georgia 30350. JC Marketing is no longer appointed with Columbus Life.  Upon information and belief, Golden Cove and JMC Ins. were dissolved.

4.      Defendant Jun Rong Chen, a/k/a John Chen ("Chen"), is the registered Secretary, Chief Executive Officer, and Chief Financial Officer of JC Marketing, and is (or was) a licensed insurance producer. Chen has served as "Marketing Director" for JC Marketing and its predecessor entities. Upon information and belief, Chen resides at 31 Westland Drive, Glen Cove, NY 11542.

5.      Defendant Cui Cui Fang, a/k/a Bella Fang ("Fang"), is purportedly the "Brokerage Director" for JC Marketing, and an individually licensed insurance producer who produced more

2

than one hundred Columbus Life policies between 2016 and 2024. Upon information and belief, Fang resides at 14480 Sanford Ave, Apt. 1C, Flushing, NY 11355. Fang is no longer appointed with Columbus Life.

6.     Defendant Chen Guan Huang, a/k/a Jason Huang ("Huang"), is a licensed insurance producer affiliated with JC Marketing. Huang contracted with Columbus Life as an independent producer through JC Marketing's predecessor and solicited applications for Columbus Life between 2016 and 2022. Huang resides at 157 Broome Street, Apt. 6A, New York, NY 10002. Huang is no longer appointed with Columbus Life.

7.     Defendant Jin Yan Yang, a/k/a Jinyan Yang, a/k/a Janett Yang ("Yang"), is a licensed insurance producer affiliated with JC Marketing. Yang contracted with Columbus Life as an independent producer and solicited more than one hundred applications for Columbus Life between 2016 and 2024. Upon information and belief, Yang resides at 157 Broome Street, Apt 6A, New York, NY 10002. Yang is no longer appointed with Columbus Life.

8.     Defendant Bi Jin Chen is a licensed insurance producer affiliated with JC Marketing who contracted with Columbus Life as an independent producer. Bi Jin Chen resides at 658 51st Street, Floor 3, Brooklyn, NY 11220, and is no longer appointed with Columbus Life.

9.     Defendant Feng Zeng Chen is a licensed insurance producer affiliated with JC Marketing who contracted with Columbus Life as an independent producer. Feng Zeng Chen resides at 729 46th Street, Floor 2, Brooklyn, NY 11220, and is no longer appointed with Columbus Life.

10.    Defendant Min Juan Chen is a licensed insurance producer affiliated with JC Marketing who contracted with Columbus Life as an independent producer. Upon information and

belief, Min Juan Chen resides at 7701 Spruce Mill Drive, Yardley, PA 19067. Min Juan Chen is no longer appointed with Columbus Life.

11.     Defendant Bang Liu is a licensed insurance producer affiliated with JC Marketing who contracted with Columbus Life as an independent producer. Bang Liu resides at 6621 13th Ave., Brooklyn, NY 11219, and is no longer appointed with Columbus Life.

12.     Defendant Yan Ping You is a licensed insurance producer affiliated with JC Marketing who contracted with Columbus Life as an independent producer. Yan Ping You resides at 1075 Railroad Ave., Staten Island, NY 10306, and is no longer appointed with Columbus Life.

13.     Defendant Hong Yan Zhang is a licensed insurance producer affiliated with JC Marketing who contracted with Columbus Life as an independent producer. Upon information and belief, Hong Yan Zhang resides at 4242 Colden Street, Apt. A4, Flushing, NY 11355. Hong Yan Zhang is no longer appointed with Columbus Life.  Collectively, Bi Jin Chen, Feng Zeng Chen, Min Juan Chen, Bang Liu, Yan Ping You, and Hong Yan Zhang will be referred to as "The Independent Producers."

14.     Defendant Christopher Wang, M.D., a/k/a Sein Myint ("Dr. Wang") is a licensed physician employed by HealthChoice Medical Services, PLLC who conspired with Defendants to submit fraudulent medical records to Columbus Life in support of life insurance applications submitted through JC Marketing and its predecessors. Upon information and belief, Dr. Wang resides at 7 Chatham Square, Basement C1, New York, NY 10038-1000.

15.     Defendant Jenny Cheng, M.D., ("Dr. Cheng") is a licensed physician who conspired with Defendants to submit fraudulent medical records to Columbus Life in support of life insurance applications submitted through JC Marketing and its predecessors. Upon information and belief, Dr. Cheng resides at 552 Darwin Blvd, Edison, NJ 08820-2342.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over Columbus Life's federal law claims pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c). This Court has supplemental jurisdiction over Columbus Life's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so closely related to the federal claims brought herein as to form part of the same case or controversy.

17.     This Court also has subject matter jurisdiction over this matter under 28 U.S.C. § 1332(a)(1) because diversity of citizenship exists between Columbus Life and Defendants, and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

18.     This Court has personal jurisdiction over all Defendants under 18 U.S.C. § 1965(b) based on sufficient minimum contacts that exist between Defendants and New Jersey, including, but not limited to the targeted solicitation and procurement of insurance policies on the lives of New Jersey residents through Golden Cove, JMC Ins., and JC Marketing from November 2016 to March 2024. *See* Appendix C (listing over 40 New Jersey policies submitted by Golden Cove, JMC Ins., and JC Marketing); Appendix B (listing all applications submitted to Columbus Life by Golden Cove, JMC Ins., and JC Marketing that did not lead to an in-force policy, including over 60 New Jersey applications). As participants and co-conspirators in a RICO enterprise where at least one defendant maintains sufficient minimum contacts with the State of New Jersey, "the ends of justice require that other parties residing in any other district be brought before the court." 18 U.S.C. § 1965(b).

19.     Venue is proper in the District of New Jersey under 28 U.S.C. § 1391 because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this district, the material misrepresentations described in this Complaint were directed at Columbus Life from this district, and Columbus Life issued over 40 policies for delivery in this district.

Moreover, as detailed herein, Defendants received substantial compensation from sales in this district, and made numerous misrepresentations that had a substantial effect in this district.

## STATEMENT OF THE CASE

I.    **Columbus Life Enters Into A Longstanding Contractual Relationship With JC Marketing.**

20.    Columbus Life is in the business of offering competitive life insurance and annuity solutions to individuals, families, and businesses looking to protect themselves from loss.

21.    To reach consumers, Columbus Life works with a nationwide network of independent representatives, which include independent insurance producers, and producing general agencies.

22.    In or around October 2016, Fang and Chen contacted Columbus Life to request that Golden Cove be appointed with Columbus Life as a producing general agent to market, solicit, and submit policies for Columbus Life through its network of affiliated producers. Fang and Chen offered to help Columbus Life reach business owners in the Chinese American community who wanted and needed insurance on their lives.

23.    In 2016, Columbus Life and Golden Cove entered into a Producing General Agent Agreement (the "PGA Agreement"), wherein Columbus Life appointed Golden Cove as a producing general agent to solicit and submit business through Golden Cove's affiliated network of individual producers (*i.e.,* "representatives"), and Columbus Life agreed to compensate Golden Cove with commissions for successfully placing policies.

24.    Accordingly, beginning in 2016 and through 2024, Fang and Chen introduced their network of independent life insurance producers, including the Independent Producers, to Columbus Life; Columbus Life contracted with each individual producer, and appointed them as independent producers through Golden Cove, JMC Ins., and/or JC Marketing.

6

25.     On July 11, 2018, JMC Ins. succeeded Golden Cove under the PGA Agreement, and on March 8, 2024, JC Marketing succeeded JMC Ins. under the PGA Agreement.

26.     Between 2016 and 2024, Fang and Chen (through Golden Cove, JMC Ins., and JC Marketing) submitted nearly 600 life insurance applications to Columbus Life, resulting in Columbus Life issuing approximately 250 policies with an aggregate face amount of over $160 million. Columbus life paid Golden Cove, JMC Ins., JC Marketing, and the Independent Producers over $5 million in commissions.[1]

27.     Columbus Life trusted Fang, Chen, and the network of Golden Cove, JMC Ins., and JC Marketing producers to, *inter alia*, submit legitimate life insurance business and truthful insurance applications. Columbus Life trusted that they would not submit applications concealing illegal human-life wagering arrangements—often referred to as stranger-originated life insurance or "STOLI" (*i.e.,* where policies are created, funded, and designed for the benefit of third party investors).

28.     However, unbeknownst to Columbus Life, Fang, Chen, and the Independent Producers were not the respectable insurance professionals they appeared to be, and they did not submit much (if any) legitimate life insurance business to Columbus Life. Instead, they routinely and systematically conspired with others, like Dr. Wang and Dr. Cheng, paramedical examiner Yong Liang Fang a/k/a Yong Liang ("Yong Liang"), and notary Ruxin Lin, in order to defraud life insurance carriers, including but not limited to Columbus Life.

---

[1] All applications submitted to Columbus Life by Golden Cove, JMC Ins., and JC Marketing that led to an in-force policy are described in Appendix A. All applications submitted to Columbus Life by Golden Cove, JMC Ins., and JC Marketing that did not lead to an in-force policy (*e.g.,* because Columbus Life denied the application or it was withdrawn) are set forth in Appendix B.

II.     **The JC Marketing Insurance Fraud Scheme.**

29.     Unbeknownst to Columbus Life, at the time it entered into the PGA Agreement with Golden Cove in October 2016, Fang and Chen had already partnered with Huang and Yang to develop, operate, and control a complex life insurance fraud scheme (the "Scheme").

30.     The Scheme was designed to generate illicit policies on the lives of Chinese nationals that would be paid for by third party investors.

31.     These policies would generate lucrative commissions for Fang, Chen, Huang, Yang, and their affiliated producers, and would generate lucrative policies in which small business owners could invest (*i.e.,* by funding the premiums) and then profit (*i.e.*, by collecting death benefits after the insureds died).

32.     The Scheme primarily targeted Chinese nationals between the ages of 50-75, who had recently immigrated to the United States, had little (if any) assets, had little (if any) income, and who were not suitable for life insurance.

33.     Upon information and belief, Chen, Fang, Huang, and Yang targeted these low-income Chinese immigrants because they were vulnerable, easily taken advantage of, lacked resources, owed debts to others (meaning they could easily be persuaded to allow policies to be taken out on their lives), and/or were unlikely to speak up or report the fraud.

34.     Chen, Fang, Huang, and Yang found potential insureds by marketing the Scheme to small business owners—especially the owners of Chinese restaurants who employ recent Chinese immigrants and/or assist in housing recent Chinese immigrants.

35.     Upon information and belief, the business owners would then identify potential insureds, often from within their own low-paid (or non-paid) workforce, and refer them to Fang, Chen, Huang, and/or Yang to see if the proposed insureds would qualify for the Scheme.

36.     Chen, Fang, Huang, and Yang knew that many of these proposed insureds were not actually seeking insurance, had no legitimate need for insurance, had poor health, had little to no means to pay for insurance, and that Columbus Life would almost certainly not issue a policy on their lives—including because the true purpose of such policies was human-life wagering by third parties.

37.     Consequently, Chen, Fang, Huang, and Yang created elaborate and false profiles to make these proposed insureds appear to be healthy, wealthy, and suitable for insurance—none of which was true.

38.     The Scheme was systematic, continuous, and consistent. Indeed, upon information and belief, the overwhelming majority of applications submitted to Columbus Life between 2016 and 2024 by Chen, Fang, Huang, Yang, and their network of affiliated producers (including the Independent Producers) through Golden Cove, JMC Ins., and JC Marketing, were products of the Scheme, and almost always included the following types of fraud:

### *Financial Fraud*

39.     Columbus Life considers a proposed insured's financial condition to be an important factor when underwriting an application because, among other things, it directly influences whether the requested coverage amount is justified, and whether the applicant can afford the policy's premiums.

40.     Accordingly, Columbus Life requires applicants to disclose the proposed insured's occupation, employer, number of years employed, annual earned income, and net worth.

41.     Chen, Fang, Huang, and Yang systematically caused applications to be submitted to Columbus Life knowing that they contained false statements about the proposed insureds' financial status: usually falsely representing that the insureds were "business partners" or "owners"

of a Chinese restaurant, had a multi-million-dollar net worth and six-figure annual income, when, in fact, most of the insureds were not business owners, did not own property, had very little (if any) income, and had very little (if any) assets.

### Health Fraud

42.     Columbus Life considers the health and medical history of proposed insureds to be two of the most important factors when underwriting an application.

43.     Accordingly, Columbus Life's insurance applications ask applicants various questions about their lifestyle (*e.g.*, whether they use tobacco, drink alcohol or plan to travel or reside internationally), and their health history (including whether they are under the care of a physician, and whether they have ever been diagnosed with or treated for any of several enumerated adverse medical conditions).

44.     Fang, Chen, Huang, and Yang systematically caused applications to be submitted to Columbus Life knowing that they contained multiple false answers to these material lifestyle and health questions; indeed, most life insurance applications submitted to Columbus Life through Golden Cove, JMC Ins., or JC Marketing (*i.e.,* continuously between 2016-2024) denied all adverse lifestyle and health conditions despite the fact that most insureds were *not* in good health, had several adverse medical conditions (like high blood pressure and diabetes), many used tobacco and/or drank alcohol, and many planned to return to (and primarily reside in) China.

45.     Fang, Chen, Huang, and Yang also systematically submitted applications to Columbus Life that either falsely concealed that proposed insureds had a primary care physician (*i.e.,* to prevent Columbus Life from discovering adverse medical history), or, created the false impression that the reason the proposed insureds did not have primary care physicians was because they were in good health—when, as Fang, Chen, Huang, and Yang knew, the real reason many

10

insureds did not represent having primary care physicians was because many truly obtained medical care in China, or otherwise lacked the means or ability to obtain regular medical care in the United States.

46.    Fang, Chen, Huang, and Yang further concealed insureds' adverse medical conditions by systematically conspiring with paramedical examiners (such as Yong Liang) to falsely complete medical forms stating that insureds were in good health, and to create and submit falsified records from purported in-person paramedical examinations to Columbus Life.

47.    In order to place larger face-amount policies, Fang, Chen, Huang, and Yang also regularly conspired with physicians, including Dr. Wang and Dr. Cheng, to create and submit falsified records of primary care visits to Columbus Life.

48.    In fact, Yong Liang, Dr. Cheng, Dr. Wang, and other third parties routinely conspired with Defendants to submit falsified medical records to Columbus Life—*e.g.,* that purposefully described medical examinations, tests, and visits that either never took place, or were falsified in order to defraud Columbus Life into issuing policies it would not otherwise issue.

### *Falsified Signatures*

49.    Columbus Life considers the consent, participation, and express representations of its proposed insureds/applicants in the application process to be a material aspect of issuing policies and placing them in force; consequently, proposed insureds must sign various pieces of the application (often electronically) representing that they consent to the insurance application and that all statements are accurate, and they must sign various delivery requirements (by hand), representing that they (i) have remained in good health, (ii) amended the application (as is often necessary), and (iii) accepted the policy for delivery.

50.     Upon information and belief, Fang, Chen, Huang, and/or Yang (or someone acting at their direction and under their control) systematically falsified the signatures of proposed insureds and policyowners on the overwhelming majority of application and delivery packages sent to Columbus Life through Golden Cove, JMC Ins., and JC Marketing between 2016-2024; that is, Fang, Chen, Huang, and Yang were regularly submitting documents to Columbus Life they knew were not actually signed by the insureds or policyowners, but were falsified. Indeed, many of the policy documents submitted to Columbus Life through Golden Cove, JMC Ins., and JC Marketing between 2016-2024 appear to include falsified signatures *from the same hand*.

51.     Fang, Chen, Huang, and/or Yang also regularly conspired with notaries, including but not limited to Ruxin Lin (a notary public in New York), to falsely bear witness to signatures of insureds and/or policy owners on application materials, change-of-ownership requests, and other policy forms—to conceal the fraud and to provide the false impression to Columbus Life of verified signatures.

### *Insurable Interest Fraud*

52.     For centuries, speculators have sought to use insurance as a means to wager on the lives of strangers. To prevent this, the laws of virtually all states require that life insurance policies be procured at inception by a person or entity having an insurable interest in the life of the insured—usually an immediate family member.

53.     Columbus Life screens for insurable interest at underwriting in several ways, including by asking an applicant to identify who will pay the premium, asking financial questions to ascertain whether the insured can afford to pay the premium, asking the purpose of the insurance, and by asking whether there is any intention to sell or assign the policy.

54.     Chen, Fang, Huang, and Yang systematically submitted (or caused to be submitted) applications to Columbus Life (through Golden Cove, JMC Ins., and JC Marketing) that they knew affirmatively misrepresented that proposed insureds had the means to pay for premium (when they did not), that insureds would pay the premium themselves (when almost none of them did), that the policies were designed to provide estate-planning or income replacement (when the insureds had very little income, no bona fide need for estate-planning, and the true purpose of the policies was to wager on human lives), and that there was no intention to sell or assign the policies (when, in fact, the insureds were only nominal owners, and the intention in many cases was to transfer formal ownership over to third parties).

### *Residency/Citizenship Fraud*

55.     Columbus Life considers a proposed insured's place of residence to be an important factor when underwriting an application. For example, Columbus Life is licensed to conduct the business of insurance in the District of Columbia, and all states except New York. Thus, Columbus Life does not issue policies for delivery in New York.

56.     In addition, Columbus Life will issue policies only on insureds with an established address history in the United States, and who do not, for example, truly reside in a foreign country.

57.     Furthermore, Columbus Life will issue policies only on insureds with certain valid immigration statuses. For example, Columbus Life will not knowingly insure illegal immigrants or persons whose official U.S. travel documents were falsified or expired.

58.     Fang, Chen, Huang, and Yang systematically caused applications submitted through Golden Cove, JMC Ins., and JC Marketing to falsely represent that the insureds lived in a state where Columbus Life is licensed to do business when, in fact, many insureds were actually living primarily (if not entirely) in New York.

59.     Fang, Chen, Huang, and Yang also systematically caused applications submitted to Columbus Life through Golden Cove, JMC Ins., and JC Marketing to materially misrepresent the proposed insureds' residency, citizenship, or permanent resident status in the United States, when in fact, the proposed insureds truly resided abroad (*e.g.*, in China), and/or lacked valid immigration status.

60.     In sum, upon information and belief, in the overwhelming majority of the applications submitted to Columbus Life through Golden Cove, JMC Ins., and JC Marketing between 2016 and 2024, Chen, Fang, Huang, and Yang systematically caused material misrepresentations to be made to Columbus Life as to the financial condition of the insureds, the health condition of the insureds, the identity, residence and insurability of the insureds, the extent to which the insureds had existing policies insuring their lives, the true purpose of the policies, the true source of premiums, and concealed that most of these policies were covers for illicit human-life wagers designed to benefit third parties with illegally obtained death benefit proceeds.

## SPECIFIC EXAMPLES OF THE SCHEME

61.     **Fraudulent Example Policy 1 (#CM5170564U):** On or about June 6, 2023, Fang (through JMC Ins.) electronically signed an application for a $1,000,000 policy on a 76-year-old named Li Chen Yang, electronically submitting it to Columbus Life via the company's online portal. Fang intentionally and/or with reckless disregard for the truth, materially misrepresented therein that Li Chen Yang (i) was a resident of Florida; (ii) was a "business partner" at the "China Buffet" with a net worth of $3,680,000 and an annual income of $225,000; (iii) would pay premium; and (iv) "Never Used" any form of nicotine, including in the prior 12 months, and did not consume alcoholic beverages. On June 27, 2023, Fang faxed Columbus Life medical records purporting to reflect primary care checkups on Li Chen Yang conducted by Dr. Wang in 2018, 2020, and 2023, which Fang (and Dr. Wang) knew to be falsified—*i.e.,* because the records

14

described medical visits some or all of which never took place and/or the records did not accurately describe Li Chen Yang's health. On July 10, 2023, in response to questions by Columbus Life asking why Li Chen Yang had not underdone more rigorous testing, Chen emailed Columbus Life falsely stating that Li Chen Yang was under the care of a "PCP" and falsely stated that Li Chen Yang had undergone medical exams in 2018, 2020, and 2023, knowing that some or all of those exams did not take place. Columbus Life issued a policy on Li Chen Yang's life (No. CM5170564U) on or about July 17, 2023 in reliance on the application and supporting materials. Li Chen Yang was not under the care of Dr. Wang (Li Chen's passport confirmed he was in China at the same time Dr. Wang was supposedly examining him in the United States); Li Chen Yang was not in good health—he died a few months later in China.

62.    **Fraudulent Example Policy No. 2 (#CM5101441U):** On or about February 27, 2017, Dan Ni, a licensed insurance producer affiliated with JC Marketing who was then appointed with Columbus Life, electronically signed (through Golden Cove) an application for a $300,000 policy on a 74-year-old named Fenduo Chen, electronically submitting it to Columbus Life via the company's online portal. Dan Ni intentionally and/or with reckless disregard for the truth, materially misrepresented therein that Fenduo Chen (i) resided in the United States; (ii) had a net worth of $589,000 and annual income of $32,000; (iii) would pay the premium; and (iv) never suffered from or was diagnosed with high blood pressure, diabetes, or cancer. On or about February 27, 2017, Dan Ni electronically submitted a paramedical examiner's report falsely stating that Fenduo Chen had undergone a paramedical exam. On April 11, 2017, Fang emailed Columbus Life misrepresenting that Fenduo Chen consulted with a medical professional in the United States and that Fenduo Chen would continue to do so on a "regular basis" in the future to confirm his good health. Columbus Life issued the policy on Fenduo Chen's life (No. CM5101441U) on or

about April 18, 2017 in reliance on the application and supporting materials. On or around April 20, 2017, Chen emailed Columbus Life the executed delivery requirements knowing Fenduo Chen's purported signatures therein were falsified and intending to create the false impression that Fenduo Chen had actually signed the documents. After Fenduo Chen passed away in China, Fang, on or about July 3, 2019, mailed documents to Columbus Life (from New York) falsely representing that Fenduo Chen died while on a family "vacation" in China, when, in fact, Fenduo Chen had been living primarily (if not entirely) in China between 2015-2018, where he was hospitalized for months at a time due to cancer—all of which was fraudulently concealed from Columbus Life in the application process.

63.    **Fraudulent Example Policy No. 3 (#CM5138184U):** On or about August 21, 2020, Yang (through JMC Ins.) electronically signed an application for a $500,000 policy on a 77-year-old named Quan Jin Wang, electronically submitting it to Columbus Life via the company's online portal. Yang intentionally and/or with reckless disregard for the truth, materially misrepresented therein that Quan Jin Wang (i) was a resident of California; (ii) had a net worth of $1,920,000 and an annual income of $205,000; (iii) was under the care of Dr. Li Li; and (iv) would pay premium. Columbus Life issued a policy on Quan Jin Wang's life (No. CM5138184) on or about August 26, 2020 in reliance on the application and supporting medical materials. On September 9, 2020, Fang emailed Columbus Life the executed delivery requirements, knowing that Quan Jin Wang's purported signatures were falsified and intending to create the false impression that Quan Jin Wang had actually signed the documents. Quan Jin Wang was not living in California (she was residing in New York); Quan Jin Wang's primary care physician was not Dr. Li Li, (it was a Dr. Jing); and Quan Jin Wang did not meaningfully participate in the application

process (she admitted to Columbus Life's investigators that she had no independent knowledge of this policy).

64.    **Fraudulent Example Policy No. 4 (#CM5123060U):** On or about June 20, 2018, Hong Yan Zhang (through Golden Cove) electronically signed an application for a $1,000,000 policy on a 72-year-old named Yiyi Lin, electronically submitting it to Columbus Life via the company's online portal. Hong Yan Zhang intentionally and/or with reckless disregard for the truth, materially misrepresented therein that Yiyi Lin (i) was a resident of Pennsylvania; (ii) was employed as a "business partner" of "Duoleimi Spa and Beauty Salon" with a net worth of $1,889,000 and annual income of $138,000; (iii) was in good health; (iv) would pay premium; and (v) was under the care of Dr. Wang. On July 14, 2018, Fang emailed Columbus Life attaching medical records purporting to reflect primary care checkups of Yiyi Lin by Dr. Wang in 2017 and 2018 that Fang (and Dr. Wang) knew to be falsified—because such visits never took place and/or the records do not accurately reflect Yiyi Lin's health. Columbus Life issued a policy on Yiyi Lin's life (No. CM5123060U) on or about February 1, 2019 in reliance on the application and supporting materials. Yiyi Lin was not in good health (she has long been in a nursing home); YiYi Lin was not a genuine patient of Dr. Wang's (the records appear falsified); and YiYi Lin was not a wealthy owner of a spa (the spa does not exist and YiYi Lin does not appear to have a financial footprint anywhere in the United States).

65.    **Fraudulent Example Policy No. 5 (#CM5137924U):** On or about August 13, 2020, Fang (through JMC Ins.) electronically signed an application for a $500,000 policy on a 67-year-old named Mei Ying Zheng, electronically submitting it to Columbus Life via the company's online portal. Fang intentionally and/or with reckless disregard for the truth, materially misrepresented therein that Mei Zheng (i) was a resident of Ohio; (ii) was employed as a "business

owner" of "Family Happy Chinese Food," with a net worth of $1,680,000 and annual income of $110,000; (iii) had "Never Used" any nicotine products; and (iv) would pay premium. On August 14, 2020, Fang faxed Columbus Life a medical examiner's report and other medical records purporting to confirm Mei Zheng's good health, that Fang knew to be falsified. On August 27, 2020, Chen emailed Columbus Life lab results purportedly for Mei Zheng that Chen knew to be falsified. Further, in response to Columbus Life's request for renewed medical records demonstrating that the insured is not a smoker, Chen emailed Columbus Life on September 4, 2020 fraudulently stating that Mei Zheng was not a smoker, which Chen knew to be false. Columbus Life issued the Policy on Mei Zheng's life (No. CM5137924U) on or about September 10, 2020 in reliance on the application and supporting materials. On or around September 16, 2020, Chen emailed Columbus Life the executed delivery requirements, knowing Mei Zheng's purported signatures on the documents therein were falsified, and intending to create the false impression that Mei Zheng had actually signed the documents. Mei Zheng was not living in Ohio (she was living in Brooklyn, NY); Mei Zheng was not a business partner at Family Happy Chinese Food (she was retired); and Mei Zheng was not under the care of Dr. Cheng (Mei Zheng recently admitted this to Columbus Life's investigators).

66.    **Fraudulent Example Policy No. 6 (#CM5177814U):** On or about February 7, 2024, Fang (through JMC Ins.) electronically signed an application for a $750,000 policy on a 71-year-old named Xu Dian Dong, electronically submitting it to Columbus Life via the company's online portal. Fang intentionally and/or with reckless disregard for the truth, materially misrepresented therein that Xu Dian Dong (i) was a resident of Pennsylvania; (ii) was a "business partner" at "Mt. Fuji Asian Fusion" with a net worth of $2,580,000 and annual income of $166,000; and (iii) would pay premium. On or around February 7, 2024, Fang electronically submitted to

Columbus Life medical records purporting to reflect primary care checkups of Xu Dian Dong conducted by Dr. Wang in 2020, 2021, 2022, and 2023, which Fang (and Dr. Wang) knew to be falsified—because some or all of those visits did not take place and/or the records did not accurately reflect Xu Dian Dong's health. On February 12, 2024, Chen called Columbus Life, falsely stating that Xu Dian Dong was going to use his business and personal income to fund premium payments, when Chen knew that was not true. On February 14, 2024, Columbus Life issued a policy on Xu Dian Dong (No. CM5177814U) in reliance on the application and supporting medical materials. That same day, Chen emailed Columbus Life the executed delivery requirements, knowing Xu Dian Dong's purported signatures on the documents therein were falsified, and intending to create the false impression that Xu Dian Dong actually signed the documents. Xu Dian Dong's identifying information was falsified: the phone number and address provided did not belong to Xu Dian Dong (they belonged to Chen); Xu Dian Dong was not living in Pennsylvania (he was likely residing in New York); Xu Dian Dong was not a business partner at Mt. Fuji (several employees confirmed he does not work there); Xu Dian Dong does not have a multi-million-dollar net worth (public record searches show no property ownership or financial profile in the United States); and Xu Dian Dong was not a genuine patient of Dr. Wang's (the records appear falsified as part of a pattern and practice of fabricating medical care).

67. **Fraudulent Example Policy No. 7 (#CM5166606U):** On or about February 1, 2023, Chenggong Chen, a licensed insurance producer affiliated with JMC Ins. who was then appointed with Columbus Life, electronically signed (through JMC Ins.) an application for a $500,000 policy on a 71-year-old named Saiyu Su, electronically submitting it to Columbus Life via the company's online portal. Chenggong Chen intentionally and/or with reckless disregard for the truth, materially misrepresented therein that Saiyu Su (i) was a resident of New Jersey; (ii) a

"business owner" at "Sakura Japanese Steak and Seafood House" with a net worth of $1,890,000 and annual income of $170,000; and (iii) would pay premium. On or around February 6, 2023, Chenggong Chen electronically submitted to Columbus Life medical records purporting to reflect that Saiyu Su sat for a paramedical examination to confirm her good health, which Chenggong Chen knew to be falsified—*i.e.,* because the records described a paramedical exam that never took place. Columbus Life issued a policy on Saiyu Su's life (No. CM5166606U) on or about February 14, 2023 in reliance on the application and supporting materials. On February 15, 2023 Chen emailed Columbus Life the executed delivery requirements, knowing that Saiyu Su's purported signatures on the documents therein were falsified, and intending to create the false impression that Saiyu Su actually signed the documents. Saiyu Su was not residing in New Jersey (she was living in New York); Saiyu Su was not a partner at Sakura and did not have a multi-million-dollar net worth (she does not appear to have been employed, does not own property, or have any financial profile in the United States); and Saiyu Su's falsified signatures appear to be in the same handwriting used to falsify insureds' signatures on a significant number of policies submitted by Golden Cove, JMC Ins., and JC Marketing.

68.    **Fraudulent Example Policy No. 8 (#CM5166443U):** On or about January 26, 2023, Yang (through JMC Ins.) electronically signed an application for a $2,000,000 policy on a 75-year-old named Yue Yin Zheng, electronically submitting it to Columbus Life via the company's online portal. Yang intentionally and/or with reckless disregard for the truth, materially misrepresented therein that Yue Yin Zheng (i) was a resident of Minnesota; (ii) was a "business partner" at "China House" with a net worth of $2,300,000 and annual income of $280,000; and (iii) would pay premium. On January 31, 2023, and again on February 6, 2023, Fang electronically submitted medical records to Columbus Life purporting to reflect that Yue Yin Zheng sat for a

paramedical examination by Yong Liang on or around December 11, 2022, and that Yue Ying

Zheng received regular primary care checkups by Dr. Cheng in 2018, 2019, 2020, 2021, and 2022,

which records Fang, Yang, Yong Liang and Dr. Cheng knew to be falsified—*i.e.,* because they

described physical exams some or all of which never took place and/or did not accurately describe

Yue Yin Zheng's health. On or about February 13, 2023, Columbus Life issued a policy on Yue

Yin Zheng's life (No. CM5166443U) in reliance on the application and supporting materials. On

or about February 15, 2023, Chen electronically transmitted the executed delivery requirements to

Columbus Life, knowing that Yue Yin Zheng's purported signatures on the documents therein

were falsified, and intending to create the false impression that Yue Yin Zheng actually signed the

documents. Yue Yin Zheng was not residing in Minnesota (she was likely residing in New York);

Yue Yin Zheng was not a partner at China House (the restaurant is owned by third parties); Yue

Yin Zheng was never the intended premium payor (she lacked the financial means to do so, and

the premiums were actually paid by third parties lacking an insurable interest in her life); and Yue

Yin Zheng was not seen by Dr. Cheng as indicated (the records appear falsified).

69.     **Fraudulent Example Policy No. 9 (#CM5165004U):** On or about December 3,

2022, Min Juan Chen (through JMC Ins.) electronically signed an application for a $500,000 policy

on a 60-year-old Louisiana resident named Jin Feng Huang, electronically submitting it to

Columbus Life via the company's online portal. Min Juan Chen intentionally and/or with reckless

disregard for the truth, materially misrepresented therein that Jin Feng Huang: (i) was a "business

partner" at "Tokyo Grill of Baton Rouge" with a net worth of $1,980,000 and an annual income

of $136,000; and (ii) would pay premium. On or around December 12, 2022, Min Juan Chen faxed

Columbus Life medical records purporting to reflect that Jin Feng Huang sat for a paramedical

examination, that Min Juan Chen knew to be falsified—*i.e.,* because the records described a

paramedical exam that never took place and/or such records did not contain genuine test results from any such examination. On or about December 14, 2022, Columbus Life issued a policy on Jin Feng Huang's life (No. CM5165004U) on the basis of the application and supporting materials. On December 23, 2022, and again on December 27, 2022, Chen emailed Columbus Life executed delivery requirements, knowing that Jin Feng Huang's purported signatures on the documents therein were falsified, and intending to create the false impression that Jin Feng Huang had actually signed the documents. Jin Feng Huang was not living in Louisiana (she was likely living in New York); Jin Feng Huang was not a partner at Tokyo Grill (she does not appear to have had meaningful employment or any financial footprint in the United States); Jin Feng Huang did not sign the delivery requirements (the handwriting is not hers, and instead appears to be written by the same hand that fraudulently impersonated insureds on several other policies submitted by Golden Cove, JMC Ins., and JC Marketing).

70.    **Fraudulent Example Policy No. 10 (#CM5128056U):** On or about January 26, 2023, Yan Ping You (through JMC Ins.) electronically signed an application for a $500,000 policy on a 77-year-old named Zuogun Shi, electronically submitting it to Columbus Life via the company's online portal. Yan Ping You intentionally and/or with reckless disregard for the truth, materially misrepresented therein that Zuogun Shi (i) was a resident of New Jersey; (ii) was a "business partner" at "Peking Duck" with a net worth of $2,280,000 and annual income of $159,000; and (iii) would pay premium. On August 29, 2019, Yan Ping You faxed Columbus Life medical records purporting to reflect visits by Zuogun Shi with his primary care physician, Dr. Cheng, in 2018 and 2019, which Yan Ping You (and Dr. Cheng) knew to be falsified—because some or all of those visits did not take place and/or the records did not accurately describe Zuogun Shi's health. On or about October 19, 2019, Columbus Life issued a policy on Zuogun Shi's life

(No. CM5128056U) in reliance on the application and supporting materials. On or about October 22, 2019 and October 24, 2019, Yan Ping You electronically submitted to Columbus Life the delivery requirements, knowing Zuogun Shi's purported signatures on the documents therein were falsified and intending to create the false impression that Zuogun Shi actually signed the documents. Zuogun Shi died on December 12, 2024. Zuogun Shi was not living in New Jersey (he was likely living with his son in New York where he died); Zuogun Shi was not a partner at Peking Duck (the restaurant is owned by third parties and Zuogun Shi was a farmer with an education level of 8th grade or less); Zuogun Shi was never the intended premium payor (he lacked the financial means to do so and never paid any premium); and Zuogun Shi was not under the regular care of Dr. Cheng (the records appear falsified).

## COUNT I
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
### (Against All Defendants)

71.     Columbus Life repeats and realleges the allegations set forth above as though fully set forth herein.

72.     At all relevant times, Columbus Life was and is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

73.     At all relevant times, Golden Cove, JMC Ins., JC Marketing, Chen, Fang, Huang, and Yang were and are each a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

74.     At all relevant times, each Defendant was, and is, a person that exists separate and distinct from the RICO enterprise, described below.

### *The RICO Enterprise*

75.     Golden Cove, JMC Ins., JC Marketing, Chen, Fang, Huang, Yang, the Independent Producers, Dr. Wang, Dr. Cheng, Ruxin Lin, and Yong Liang, constitute an association-in-fact

enterprise, the "JC Marketing Enterprise," within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

76.    JC Marketing (and before that Golden Cove and JMC Ins.), Chen, Fang, Huang, Yang, the Independent Producers, Dr. Wang, Dr. Cheng, Yong Liang, and Ruxin Lin are a group of persons associated together in fact for the common purpose of carrying on an ongoing criminal enterprise. In particular, the JC Marketing Enterprise has a common goal of defrauding Columbus Life (and several other life insurance companies, including, without limitation, New York Life Insurance Company,[2] Kansas City Life Insurance Company,[3] and American National Life Insurance Company[4]) out of tens of millions of dollars through a sophisticated, coordinated, sustained, and well-orchestrated scheme of deceptive conduct, including through intentional, material misrepresentations made in connection with hundreds of policies, breaches of contractual obligations, and tortious interference with Columbus Life's contractual relations, all in order to funnel its ill-gotten gains from Golden Cove, JMC Ins., and JC Marketing, to Defendants and other affiliates to promote and conduct their criminal activities, reward and incentivize participation in the Scheme, and frustrate Columbus Life's efforts to detect the fraud.

---

[2] *See, e.g.,* Complaint, *New York Life Ins. Co. et al. v. Jun Rong Chen*, 653926/2013 (N.Y. Sup. Ct.) seeking unpaid charged back commissions on thirty-seven policies rescinded by New York Life.

[3] *See, e.g.,* Complaint, *Kansas City Life Ins. Co. v. Jun Rong Chen, Glen Bay Marketing Network Inc., CuiCui Fang a/k/a Bella Fang, and Golden Cove Financial Group, Inc.*, 2:18-cv-12525-EP-LDW (D.N.J.) (alleging that Fang and Chen submitted large quantities of fraudulent policies to Kansas City Life through Golden Cove and failed to return commissions after policies were rescinded).

[4] *See, e.g.,* Complaint, *Yu Zhen Chen & Yu Hua Chen v. Am. Nat'l, Bao Ying Chen and Jun R. Chen*, No. 701141/2024 (N.Y. Sup. Ct.) (alleging that an American National policy written by Fang was subsequently misappropriated by Chen for Chen's benefit through a fraudulent change form).

77.    The members of the JC Marketing Enterprise have a long-standing, continuous business relationship spanning several years, rooted in common ownership, common control, ongoing business dealings, and a mutual interest to participate in common deceitful activities.

78.    The JC Marketing Enterprise has longevity sufficient to permit Defendants to pursue the Enterprise's goal of defrauding Columbus Life to the financial benefit of Defendants. The Scheme at the heart of the JC Marketing Enterprise has been in operation against Columbus Life since at least 2016. However, unbeknownst to Columbus Life, the JC Marketing Enterprise predates JC Marketing's PGA with Columbus Life; and, unbeknownst to Columbus Life, the JC Marketing Enterprise victimized several other insurers for the last several years.

79.    On information and belief, the JC Marketing Enterprise is ongoing and continues to victimize and target other life insurance companies through the present day.

80.    In 2013, unbeknownst to Columbus Life, New York Life sued Chen for failing to pay charged-back commission on approximately 37 policies that he submitted and that New York Life rescinded. In 2014, unbeknownst to Columbus Life, the Financial Industry Regulatory Authority, Inc. ("FINRA") sanctioned Chen for, among other things, using addresses within his control to receive policyowner mail, funding premiums on policies where he lacked an insurable interest in the insureds, and knowingly submitting false changes of policy ownership and beneficiary forms. Chen never disclosed any of this to Columbus Life and, instead, introduced himself to Columbus Life in 2016 as "John" Chen.

81.    In 2017, unbeknownst to Columbus Life, Kansas City Life Insurance Company uncovered a large number of fraudulent policies submitted by Fang and Chen through Golden Cove and rescinded over 60 such policies; and, in 2018, Kansas City Life sued Fang, Chen, and Golden Cove for failing to return the charged back commissions. Despite being caught, and in an

effort to further conceal their wrongdoing, the JC Marketing Enterprise abandoned the Golden Cove name (in favor of JMC Ins.) and continued to victimize Columbus Life without interruption for years.

82.    As detailed herein, the JC Marketing Enterprise organized itself into a cohesive group with specific and assigned responsibilities and a common structure to accomplish the common goal and purpose of the Scheme, including as follows:

    a.  Defendant Chen, as CEO and registered agent of JC Marketing, maintains command and control of the JC Marketing Enterprise on a strategic level. He controls JC Marketing's direct communications with Columbus Life related to the policies, which frequently involves email, telephone, and direct mail communications to Columbus Life's home office in Cincinnati, Ohio;

    b.  Defendant Fang, the contracting agent with respect to the PGA Agreement, similarly maintains command and control of the JC Marketing Enterprise on a strategic level. Fang controls JC Marketing's direct communications with Columbus Life related to the policies, which frequently involves email, telephone, and direct mail communications to Columbus Life's home office in Ohio. Moreover, she personally generated a large tranche of policies, and upon information and belief, routinely falsified and forged signatures of proposed insureds, policyowners, beneficiaries, Independent Producers and others on material policy and claim related documents;

    c.  Defendant Huang is an independent producer for JC Marketing, produced policies through the JC Marketing Enterprise and continues to work behind the scenes at a strategic level to control and advance the Scheme – despite the fact that he is no longer appointed with Columbus Life. Upon information and belief, Huang is the spouse of Yang, and collaborates with her and others in an effort to surreptitiously effect policy changes, submit fraudulent claim materials and otherwise profit from the JC Marketing Enterprise;

    d.  Defendant Yang is an independent producer for JC Marketing who was a prolific producer of fraudulent policies through the JC Marketing Enterprise. Upon information and belief, Yang is the spouse of Huang, and similarly maintains command and control of the JC Marketing Enterprise on a strategic level.

    e.  The Independent Producers solicited or assisted with the solicitation and submission of policy applications at the direction of Fang, Chen, Huang, and Yang;

    f.  Dr. Wang served as the purported primary care physician in connection with at least a dozen JC Marketing policies and, in doing so, knowingly and actively misrepresented and falsified the insureds' health information and medical records;

g.  Dr. Cheng served as the purported primary care physician in connection with at least a dozen JC Marketing policies and, in doing so, knowingly and actively misrepresented and falsified the insureds' health information and medical records;

h.  Yong Liang served as the paramedical examiner for dozens of policies and, in doing so, knowingly and actively misrepresented and falsified the insureds' health information, test results, and medical records; and

i.  Ruxin Lin purportedly notarized the signatures of multiple insureds and policyowners, regardless of their purported state of residence, and, in doing so, knowingly and actively misrepresented the legitimacy of multiple signatures applied to numerous policy related documents. This was done in order to effect fraudulent policy changes and ultimately direct policy proceeds to participants in the Scheme.

83.     Each Defendant knew of the existence of the JC Marketing Enterprise and conducted or participated in the operation or management of the Enterprise and its affairs.

84.     At all relevant times, the JC Marketing Enterprise was engaged in, and its activities affected, interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c). The Enterprise regularly participated in the multi-billion dollar life insurance industry, procured hundreds of policies on the lives of insureds purportedly located across the United States and, likely abroad in China, processed and communicated applications and other policy and claim related documentation across state lines to Columbus Life's home office, and held and transferred funds using national and potentially international financial institutions to fund the policies and funnel ill-gotten gains amongst participants in the Enterprise.

### *Pattern of Racketeering Activity*

85.     Defendants conducted or participated in, directly or indirectly, the management and operation of the JC Marketing Enterprise and its affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. §1962(c). To wit, they have consistently and regularly committed multiple acts of racketeering activity against Columbus

Life between 2016 and the present, which multiple acts shared a common or related purpose, goal, result, participants, victim, and method of commissions, as described below:

### *Multiple Instances of Mail and Wire Fraud in Violation of 18 U.S.C. §§ 1341 and 1343*

86.     Defendants engaged in a wide-ranging scheme to defraud Columbus Life concerning the solicitation, procurement, submission, and maintenance of fraudulent life insurance policies, based on material misrepresentations and omissions, imposter activity, fraud and forgery, to funnel their ill-gotten gains from Golden Cove, JMC Ins., and JC Marketing to Defendants and others, with the intention to promote and conduct their criminal activities, reward and incentivize participation in the Scheme, and frustrate Columbus Life's efforts to detect the fraud and prevent Defendants' collection of illicit profits.

87.     Defendants accomplished the Scheme to defraud Columbus Life by regularly and systematically misrepresenting, concealing, and failing to disclose material information from and in the course of communications with Columbus Life; falsifying and forging policy documents; falsifying and forging medical records; using interstate bank wires to transfer funds to pay premiums on fraudulent policies and receive and distribute ill-gotten gains; engaging in and facilitating sham transactions; managing and coordinating shell businesses; and systematically deceiving Columbus Life about the JC Marketing Enterprise's activities, their coordination between one another, and the true nature of their fraudulent insurance practices.

88.     In furtherance of the Scheme, Defendants transmitted, or caused to be transmitted, by means of wire communication through interstate or foreign commerce, writings, bank wires using interstate or foreign commerce, and caused matters and things to be placed in a private or commercial interstate carrier for delivery across state lines, including but not limited to:

> a. Emails, telephone calls, and other communications by wire and U.S. mail from or caused to be sent by Defendants, Yong Liang, Ruxin Lin, and/or other independent producers in Golden Cove, JMC Ins., or JC Marketing's affiliated network: (i)

encouraging or facilitating the procurement of hundreds of fraudulent policies; (ii) including or incorporating false, fraudulent or misleading statements, or omitting material information, about the policies, Defendants' business practices, or the relationships and connections between and among Defendants, insureds, owners, beneficiaries and other third parties in hundreds of policy related submissions, including claim submissions; and (iii) otherwise communicating about, promoting, or furthering the Scheme to defraud;

b. Emails, telephone calls, and other communications by wire and mail from or caused to be sent by Defendants, Yong Liang, Ruxin Lin, and/or other independent producers in Golden Cove, JMC Ins., or JC Marketing's affiliated network to third parties, in furtherance of the Scheme to defraud, with or without those third parties' knowledge of the true purpose of those communications, including: (i) requests for payment; (ii) misrepresentations or omissions about policies; (iii) authorizing payments; and (iv) facilitating transfer of policies, or their proceeds, whether formally or informally, to third parties without insurable interests in the lives of the insureds;

c. Funds transferred and received by wire between and among Defendants, Yong Liang, Ruxin Lin, and/or other independent producers in Golden Cove, JMC Ins., or JC Marketing's affiliated network as payment and reward for participation in the Scheme, as incentive and motivation for continuing and future participation in the Scheme, with the intent that the funds be used to promote, conduct, or engage in Defendants' deceitful activities, to frustrate anticipated and/or actual efforts to recover the JC Marketing Enterprise's ill-gotten gains by making it difficult or impossible to trace and/or collect the funds, or otherwise promoting or furthering the Scheme to defraud;

d. Funds transferred between and among Defendants and third parties, with the intent that those funds be used to promote, conduct, or engage in Defendants' deceitful activities, or otherwise promote or further the Scheme to defraud, with or without those third parties' knowledge of the illegality or true purpose of those transactions.

89.    Columbus Life incorporates by reference paragraphs 61-70, which set forth examples of particular wire and mail communications made or transmitted in furtherance of Defendants' Scheme or artifice to defraud that constitute violations of 18 U.S.C. §§ 1341 and 1343.

90.    As discussed, *supra*, Defendants caused fraudulent information to be transmitted to Columbus Life at several key points in the lifecycle of a life insurance policy. These misrepresentations and omissions regularly recurred in each fraudulent policy transaction:

a.  When presenting life insurance applications to Columbus Life for underwriting approval, Defendants caused application materials containing intentional, material misrepresentations and omissions to be sent to Columbus Life's home office by email, electronic submission, fax, or mail, or other interstate wires;

b.  Defendants caused fraudulent misrepresentations to be communicated to Columbus Life via email, fax, or mail, or other interstate wires while negotiating and accepting policy terms for the JC Marketing Enterprise and its clients;

c.  Defendants caused correspondence concerning fraudulently procured policies to be sent and received by Columbus Life via email, electronic submission, fax, mail, or other interstate wires;

d.  Defendants transferred illicit funds via interstate bank wires to Columbus Life's home office to fund the premium payments required to place and keep the policies in force;

e.  Defendants caused Columbus Life to transfer ill-gotten commissions to Defendants and other independent producers in Golden Cove, JMC Ins., or JC Marketing's affiliated network via interstate wires;

f.  Defendants caused fraudulent misrepresentations and forged documents to be communicated to Columbus Life via email, fax, or mail, or other interstate wires for the purpose of submitting and perfecting claims for death benefit proceeds on fraudulently procured policies;

g.  Defendants caused ill-gotten funds to be transferred, directly or indirectly, to Defendants, Yong Liang, Ruxin Lin, and/or other third parties in connection with the payment, receipt and distribution of ill-gotten death benefit proceeds on fraudulently procured policies;

h.  Defendants caused ill-gotten funds to be transferred to Yong Liang, Ruxin Lin, and other third parties, to promote, conduct, or engage in Defendants' criminal activities, or otherwise promote or further the Scheme to defraud Columbus Life.

91.  Defendants' misrepresentations and omissions were reasonably relied on by Columbus Life in connection with, among other things, issuing policies, placing policies in force, changing ownership and beneficial interest designations, and paying commissions and unwarranted claims.

### ***Injury and Causation***

92.  Columbus Life has been and will continue to be injured in its business and property by reason of Defendants' violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.

The injuries to Columbus Life directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(c) include, but are not limited to, millions of dollars in paid commissions on the fraudulently procured policies, unpaid commissions charged back from nearly 20 rescinded and lapsed policies; administrative and underwriting costs; several millions of dollars in death benefit proceeds paid out on fraudulently procured policies; attorneys' fees and costs, including the fees and costs associated with rescinding bad policies and investigating, exposing, and prosecuting Defendants' fraudulent activities; and tens of millions of dollars in adverse mortality costs resulting from hundreds of fraudulently procured policies.

93.     Pursuant to 18 U.S.C. §1964(c), Columbus Life is entitled to recover treble damages, plus costs and attorneys' fees from Defendants.

94.     The Court should also enter such equitable relief as it deems just and proper to unwind the parties' relationship going forward.

### COUNT II
### CONSPIRACY TO RICO, 18 U.S.C. § 1962(d)
**(Against All Defendants)**

95.     Columbus Life repeats and realleges the allegations as set forth above as though fully set forth herein.

96.     Defendants, Yong Liang, and Ruxin Lin, have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c), as described above, in violation of 18 U.S.C. § 1962(d).

97.     By and through each of Defendants' close business and contractual relationships with one another, and their close coordination with one another in the affairs of the Enterprise, each Defendant knew the nature of the JC Marketing Enterprise and each Defendant knew that Defendants were engaged in a conspiracy to commit predicate acts, including those set forth above

and in Appendix A and Appendix B, and that the predicate acts were part of a pattern of racketeering activity, and each agreed to pursue the same criminal objective.

98.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the JC Marketing Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). In particular, each Defendant was a knowing, willing, and active participant in the JC Marketing Enterprise and its affairs, and each Defendant shared a common purpose, namely, the orchestration, planning, perpetration, and execution of the Scheme. In absence of the agreement, the JC Marketing Enterprise would not have operated as it did or have the longevity that it has had since approximately 2013. Further evidence of an agreement among Defendants is in the sole possession and control of Defendants.

99.    Columbus Life has been and will continue to be injured in its business and property by reason of Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial. The injuries to Columbus Life directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in paid commissions on the fraudulent policies, unpaid commissions chargebacks resulting from nearly 20 rescinded and lapsed policies; administrative and underwriting costs; several millions of dollars in death benefit proceeds paid out on fraudulently procured policies; attorneys' fees and costs, including the fees and costs associated with rescinding bad policies and exposing and prosecuting Defendants' fraudulent activities; and tens of millions of dollars in adverse mortality costs resulting from these fraudulently procured policies.

100.    Pursuant to 18 U.S.C. §1964(c), Columbus Life is entitled to recover treble damages, plus costs and attorneys' fees from Defendants.

101.    The Court should also enter such equitable relief as it deems just and proper to unwind the parties' relationship going forward.

## COUNT III
## BREACH OF CONTRACT – PGA AGREEMENT
### (Against JC Marketing and Fang)

102.    Columbus Life repeats and realleges the allegations set forth above as though fully set forth herein.

103.    Columbus Life and JC Marketing (through its predecessor, Golden Cove and Cui Cui Fang) entered into and were parties to the PGA Agreement, which was a valid and enforceable contract, a copy of which is attached as Exhibit A.

104.    At all relevant times, Columbus Life fully performed all of the material conditions, covenants, and promises required to be performed by it in accordance with the terms and conditions of the PGA Agreement.

105.    Specifically, Columbus Life agreed to (and did) compensate JC Marketing for the successful development of a sales program, including the training and supervision of individual representatives, and agreed to pay commissions to JC Marketing on individual policies delivered for which premiums have been paid.

106.    JC Marketing repeatedly and materially breached its obligations to Columbus Life under the PGA Agreement, including, but not limited to, as set forth below.

107.    Under the PGA Agreement, JC Marketing agreed to solicit life policies only in those jurisdictions where Columbus Life was licensed to conduct business. Yet JC Marketing breached the PGA Agreement on several different occasions by soliciting policies for applicant/owner/insureds living primarily in New York—a jurisdiction where Columbus Life is not licensed to conduct business.

108.    JC Marketing agreed to comply with the laws and regulations applicable to JC Marketing and its independent producers in the sale of Columbus Life's products, including but not limited to all applicable privacy, insurance, and securities laws and regulations, as well as conduct itself in an ethical and professional manner. However, JC Marketing repeatedly violated insurance laws through the repeated submission of insurance applications and supporting documentation rife with knowingly false representations, falsified supporting records, and falsified signatures, and knowingly orchestrated the submission of policies that failed to comply with state insurable interest laws. This conduct likewise repeatedly breached JC Marketing's agreement to conduct itself ethically, professionally, and in compliance with Columbus Life's rules.

109.    JC Marketing agreed "not to pay or allow any rebate of premiums or commissions in any manner, either directly or indirectly on business written by" JC Marketing or the Independent Producers through Columbus Life. However, upon information and belief, JC Marketing funded some of the premiums on policies it submitted, and upon information and belief, was sharing commissions with other actors in the JC Marketing Enterprise, including Chen, Huang, and other third parties.

110.    Further, JC Marketing agreed that if any life policy lapses or is surrendered within 12 months of the issue date, or if there is a refund of any premiums, commissions will be charged back to JC Marketing pursuant to the applicable Commission Schedule, and will be immediately repaid to Columbus Life or, at the option of the Columbus Life, deducted from the compensation payable to JC Marketing. Relatedly, JC Marketing acknowledged that if Columbus Life must cancel a contract after its issue and return the premium paid, any compensation previously credited will be charged back against JC Marketing's account. To date, premiums have been refunded on close to 20 rescinded and/or lapsed policies. But JC Marketing (and several Independent

Producers) have failed to tender back the commissions paid on these policies as required by the PGA Agreement. JC Marketing is therefore in breach of the PGA Agreement.

111.    The foregoing breaches by JC Marketing, all of which constitute violations or non-compliance with the parties' contractual obligations, triggered the automatic termination of the PGA Agreement. Accordingly, JC Marketing's indebtedness to Columbus Life is immediately due and payable.

112.    Columbus Life has suffered damages as a direct and proximate result of JC Marketing's breaches of the PGA Agreement, and, as explained below, Huang, Yang, and the Independent Producers' breach of their IP Agreements, in an amount to be proven at trial, which Columbus Life is entitled to recover from JC Marketing, together with interest, and Columbus Life's attorney's fees, costs, and expenses.

<u>**COUNT IV**</u>
<u>**BREACH OF CONTRACT– INDEPENDENT PRODUCER AGREEMENTS**</u>
**(Against Huang, Yang, Bi Jin Chen, Feng Zeng Chen, Min Juan Chen, Bang Liu, Yan Ping You, and Hong Yan Zhang)**

113.    Columbus Life repeats and realleges the allegations set forth above as though fully set forth herein.

114.    Columbus Life entered into Independent Producer Agreements with Huang, Yang, and each of the Independent Producers (*i.e.,* Bi Jin Chen, Feng Zeng Chen, Min Juan Chen, Bang Liu, Yan Ping You, and Hong Yan Zhang), copies of which are attached as Exhibits B-I, (collectively, the IP Agreements).

115.    The IP Agreements are all substantially similar.

116.    Columbus Life fully performed all of the material conditions, covenants, and promises required to be performed by it in accordance with the terms and conditions of the IP Agreements.

117.    Specifically, Columbus Life agreed to (and did) pay commissions to each of the Independent Producers in connection with one or more policies.

118.    Huang, Yang, and each of the Independent Producers agreed, through their respective IP Agreements, to solicit policies only in states where Columbus Life was licensed to conduct business; but, on information and belief, Huang, Yang, and the Independent Producers breached their respective IP Agreements by soliciting policies for applicants/owners/insureds living primarily in the State of New York.

119.    Huang, Yang, and the Independent Producers violated their respective IP Agreements by submitting application materials containing multiple material misrepresentations and omissions in violation of state insurance laws, by submitting policies designed as human-life wagers in violation of state insurable interest laws, and submitting fraudulent policy and claim related documents, all of which also violated their contractual duties to conduct business in an ethical and professional manner.

120.    Huang, Yang, and the Independent Producers violated their respective IP Agreements by, on information and belief, paying premium or allowing rebating of premium or commissions on one or more policies.

121.    Yang and the Independent Producers violated their respective IP Agreements by failing to immediately tender commissions that Columbus Life charged back.

122.    Yang and the Independent Producers agreed that if any life policy lapses or is surrendered within 12 months of issue, or if there is a refund of any premiums, commissions will be charged back pursuant to the applicable Commission Schedule, and will be immediately repaid to Columbus Life or, at the option of the Columbus Life, deducted from the compensation payable to each producer. In addition, Yang and the Independent Producers agreed that if Columbus Life

36

must cancel a policy after its issue and return the premium paid, any compensation previously credited will be charged back against their account. Columbus Life has rescinded policies produced by Yang and the Independent Producers, returned premium on those policies, and charged back the commission on those policies. Yang and the Independent Producers of those policies are in breach of their respective IP Agreements by failing to pay Columbus Life the full amount of charged-back commissions with interest.

123.    Columbus Life has suffered damages as a direct and proximate result of Huang, Yang, and each of the Independent Producers' breaches of their respective IP Agreements in an amount to be proven at trial, which Columbus Life is entitled to recover from Huang, Yang, the Independent Producers and/or JC Marketing, with interest, and Columbus Life's attorney's fees, costs, and expenses.

## COUNT V
## VIOLATION OF THE NEW JERSEY INSURANCE FRAUD PROTECTION ACT,
### N.J.S.A. 17:33A *et seq.*
### (Against All Defendants)

124.    Columbus Life repeats and realleges the allegations set forth above as if fully set forth herein.

125.    The Scheme heavily targeted New Jersey with over 100 applications submitted to Columbus Life by Golden Cove, JMC Ins., and JC Marketing between November 2016 and March 2024 seeking insurance on New Jersey residents and representing that the applications had been signed in New Jersey, resulting in over 40 New Jersey policies that Columbus Life issued for delivery in New Jersey to New Jersey applicants. A list of all New Jersey policies resulting from applications submitted by Golden Cove, JMC Ins., and JC Marketing is set forth in Appendix C. A list of all applications for New Jersey policies submitted by Golden Cove, JMC Ins., and JC

Marketing that did not result in an in-force policy (but that Columbus Life nevertheless expended resources underwriting) is included in Appendix B.

126.    Upon information and belief, the overwhelming majority of the New Jersey applications and resulting New Jersey policies submitted by Golden Cove, JMC Ins., and JC Marketing between November 2016 and March 2024 (*see* Appendix B and Appendix C) contained false and misleading statements pursuant to the Scheme discussed, *supra*. That is, a pattern and practice of false statements by Chen, Fang, Yang, Huang, and the Independent Producers (through Golden Cove, JMC Ins., and JC Marketing) in the application process regarding the insureds' place of residency, the insureds' financial information (*e.g.,* employment, net worth, income), the insured's purpose for taking out the policy (*e.g.,* falsely stating the purpose was wealth transfer or estate planning), source of premium (*e.g.,* that insureds would pay the premiums), the insureds' health (consistently stating all insureds were in good health with no adverse medical conditions), supporting documentation (*e.g.,* falsified paramedical and medical testing records), and falsified signatures.

127.    The fraudulent New Jersey policies include, without limitation, the two described in detail, *supra* at Paragraph 70 (Zuogun Shi), and *supra* at Paragraph 67 (Saiyu Su).

128.    Upon information and belief, Defendants have all participated, directly, or indirectly, in the fraudulent procurement of New Jersey life insurance policies between November 2016 and the present.

129.    Beginning as early as 2016, Defendants entered into a scheme—the Scheme—to defraud Columbus Life through the submission of a pattern of false, misleading, and fraudulent insurance applications and claims, in violation of the New Jersey Insurance Fraud Prevention Act, N.J. Stat. Ann. 17:33A-1 *et seq.* ("IFPA").

130.    A person or practitioner violates the IFPA if he or she "[p]repares or makes any written or oral statement, intended to be presented to any insurance company or producer for the purpose of obtaining . . . an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to an insurance application or contract." N.J. Stat. Ann. 17:33A-4(a)(4).

131.    A person or practitioner violates the IFPA if he or she "[p]repares or makes any written or oral statement that is intended to be presented to any insurance company . . . in connection with . . . any claim for payment or other benefit pursuant to an insurance policy . . . knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim." N.J. Stat. Ann. 17:33A-4(a)(2).

132.    Defendants are a person or practitioner within the meaning of the IFPA and committed, participated in, solicited others to engage in, and knowingly assisted, conspired with or urged others to commit the fraudulent and wrongful acts set forth herein. N.J. Stat. Ann. § 17:33A-3; N.J. Stat. Ann. § 1:1-2.

133.    Columbus Life is an insurance company within the meaning of the IFPA. It offered insurance and paid insurance claims in reasonable reliance on and as a result of the false and misleading applications and claims submitted by Defendants.

134.    As discussed, *supra*, Defendants procured (or conspired to procure) fraudulent life insurance policies in violation of the IFPA by making false statements and material misrepresentations in the course of those transactions to Columbus Life, including as to the identity and insurability of the insureds, the insureds' purported relationship to the beneficiaries and subsequent policyowners, and the purpose and lawfulness of the policies.

135.    Defendants presented these falsities and material misrepresentations to Columbus Life for the purpose of obtaining the policies, commissions, and obtaining resultant death benefit proceeds, knowing that the statements on the applications, policy documents, and claim submissions contained false or materially misleading information.

136.    As a result of Defendants' Scheme to defraud and pattern of violations of the IFPA, Columbus Life was induced to (i) provide high face-value coverage on the lives of insureds at Columbus Life's expense, (ii) pay substantial commissions to Golden Cove, JMC Ins., JC Marketing, Huang, Yang, and the Independent Producers in connection with each of the policies, and (iii) pay millions of dollars in death benefits on fraudulently procured policies.

137.    Columbus Life has also incurred damages resulting from its investigation of Defendants' Scheme to defraud in violation of the IFPA, counsel fees and costs, and other losses.

138.    Thus, Columbus Life requests judgement against Defendants for compensatory damages, treble damages, costs, and attorneys' fees pursuant to N.J.S.A. 17:33A-7.

### COUNT VI
### FRAUD
### (Against All Defendants)

139.    Columbus Life repeats and alleges the allegations set forth above as though fully set forth herein.

140.    As discussed, *supra*, Defendants engaged in multiple acts of fraud in furtherance of the Scheme between 2016 and 2024, in connection with the majority of applications submitted by Golden Cove, JMC Ins., and JC Marketing from 2016 to 2024, as listed in Appendix A and Appendix B.

141.    Upon information and belief, in hundreds of separate and individual applications, policy documents, post-issue correspondence and claim submissions, Defendants misrepresented

material information to Columbus Life. Defendants made material misrepresentations and omissions to Columbus Life about, among other things: (1) the proposed insureds' residential addresses; (2) the insureds' employment and financial status; (3) the identity of the true policyowner(s) and payor(s) of premiums; (4) the relationship(s) between insureds and beneficiaries, true policyowners, and premium payors; (5) the true health and medical history of the insureds; (6) Defendants' business practices; (7) the delivery of the policies to the insureds/owners; (8) the submission of fraudulent and forged documents designed to change the policyowner, beneficiary, or address of an insured, owner, or beneficiary; and (9) the fraudulent nature of claims submitted—specific examples of which are set forth, *supra* at Paragraphs 61-70 and, on information and belief, one or more of the aforementioned types of false statements were made by the individual producers in the overwhelming majority of the applications described in Appendix A and Appendix B.

142.   Defendants committed hundreds of acts of fraud by, among other things, manipulating their business relationships with Columbus Life as a means to fraudulently induce Columbus Life to issue high face-value life insurance policies that insureds would not otherwise qualify for and that were designed, unbeknownst to Columbus Life, as human-life wagers.

143.   Defendants knew that the material misrepresentations, omissions and fraudulent statements made to Columbus Life were false, yet purposefully made these misrepresentations to induce reliance by Columbus Life for Defendants' own financial gain.

144.   Columbus Life reasonably and justifiably relied on the material misrepresentations made by Defendants. Had Columbus Life known the truth about the Scheme, Columbus Life would not have issued the policies submitted by Golden Cove, JMC Ins., or JC Marketing, incurred

the attendant costs and expenses associated with the policies, or paid any commissions or claims associated with the policies.

145.    Columbus Life has suffered damages as a direct and proximate result of Defendants' fraud in an amount to be proven at trial, which Columbus Life is entitled to recover from Defendants, together with interest from the date of instances of fraud, and Columbus Life's attorney's fees, costs, and expenses.

### COUNT VII
### TORTIOUS INTERFERENCE
### (Against All Defendants)

146.    Columbus Life repeats and realleges the allegations set forth above as though fully set forth herein.

147.    At all relevant times, Columbus Life and the Independent Producers were parties to valid contracts, namely the IP Agreements.

148.    At all relevant times, Defendants had knowledge of Columbus Life's contracts with the Independent Producers.

149.    The Independent Producers breached their contracts with Columbus Life by soliciting fraudulent life insurance policies as part of the Scheme.

150.    Defendants intentionally, maliciously, foreseeably, directly, and proximately, without justification, and through fraudulent and illegal means induced and facilitated the Independent Producers' breaches of their contracts with Columbus Life by, *inter alia*, actively participating in the orchestration, planning, perpetration, and execution of the Scheme, which required the Independent Producers to breach their contracts. The misconduct includes, but is not limited to: (1) directing and facilitating the solicitation of hundreds of fraudulent policies by and through the Independent Producers in order to diversify and conceal the Scheme; (2) facilitating the transfer of funds used to pay premiums on the policies, all of which required Columbus Life

to pay commissions to the respective Independent Producers; (3) facilitating the payment of commissions to the Independent Producers as a result of the solicitation of fraudulent policies; and (4) using their positions of responsibility, and their business relationships as set forth above, to oversee and execute the Scheme and, in doing so, acted outside the scope of their employment with JC Marketing to take actions, and direct others to take actions, necessary to accomplish the overall aims of the Scheme, which required the Independent Producers to breach their contracts with Columbus Life.

151.    Columbus Life has suffered damages as a direct and proximate result of Defendants' tortious interference with Columbus Life's contracts in an amount to be proven at trial, which Columbus Life is entitled to recover from Defendants, together with interest from the date of instances of such tortious interference, and Columbus Life's attorney's fees, costs, and expenses.

**COUNT VIII:**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

152.    Columbus Life repeats and realleges the allegations set forth above as though fully set forth herein.

153.    Between 2016-2024, Columbus Life conferred significant benefits upon Defendants, including, without limitation, by issuing hundreds of life insurance policies, and paying millions of dollars in commissions, the fruits of which have benefited all Defendants directly or indirectly.

154.    Defendants have all been unjustly enriched by these benefits, having been able to profit from the commissions paid, the value of these in-force policies, and the death benefits that Columbus Life has been fraudulently induced to pay.

155.    In light of Defendants' fraudulent, inequitable, and illegal conduct in carrying out the Scheme, it would be unjust to allow Defendants to retain the benefits of the Scheme and of their misconduct without payment to Columbus Life.

156.    Defendants should therefore be forced to disgorge any and all commissions and claim payments received, directly or indirectly, from Columbus Life between 2016 and the present.

157.    Defendants should be forced to disgorge any and all proceeds received by Defendants as a result of their longstanding fraudulent Scheme targeting Columbus Life.

## PRAYER FOR RELIEF

WHEREFORE, Columbus Life prays for relief and judgment against Defendants as follows:

      a.    General and compensatory damages according to proof at trial;

      b.    Treble damages according to statute;

      c.    An award of Columbus Life's reasonable attorneys' fees and costs and expenses according to statute;

      d.    Disgorgement of compensation, fees, and other payments made to Defendants.

      e.    Disgorgement of all moneys received by Defendants as a result of their misconduct toward Columbus Life;

      f.    Punitive damages;

      g.    Prejudgment interest;

      h.    Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Columbus Life demands a trial by jury in this action of all issues so triable.

Dated: July 3, 2025                    Respectfully submitted,

                                       /s/ Brian D. Burack
                                       Brian D. Burack (Bar No. 047782011)
                                       Laura M. Zulick (Bar No. 025242011)
                                       COZEN O'CONNOR, P.C.
                                       1010 Kings Highway South
                                       Cherry Hill, NJ 08034
                                       T: (215) 665-2076
                                       bburack@cozen.com
                                       lzulick@cozen.com

## <u>CERTIFICATION</u>

Pursuant to Local Rule 11.2, Columbus Life discloses *Columbus Life Ins. Co. v. Yue Zin Zheng*, 1:25-cv-00090-SJD (S.D. Ohio), an action against the policyowner/insured (not a party here) to rescind or otherwise void her policy; and *Columbus Life Ins. Co. v. Sai Yu Su*, 1:25-cv-00091-DRC (S.D. Ohio), an action against the policyowner/insured (not a party here) to rescind or otherwise void her policy.


Dated: July 3, 2025                    */s/ Brian D. Burack*
                                                Brian D. Burack
                                                COZEN O'CONNOR
                                                1010 Kings Highway South
                                                Cherry Hill, NJ 08034